UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: 20-CR-00644-GPC |
|---|---|
| Plaintiff, | **ORDER DENYING DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT.** |
| v. | |
| GERARDO CARDENAS-GARCIA, | |
| Defendant. | **(ECF Nos. 23, 25, 32, 34, 35, 47, 50, 52.)** |

This Order addresses Defendant's successive motions to dismiss the Indictment alleging a due process violation resulting from the Otay Mesa Detention Center ("OMDC") response to the COVID-19 pandemic. Having reviewed the Parties' lengthy briefing, the record, and the applicable law, the Court finds that the Government's conduct here is not so outrageous as to violate due process, warrant dismissal, or provide the basis for the Defendant's release. Consequently, Defendant's motions are **DENIED**.

**I.   Procedural Background**

On April 7, 2020, Defendant Gerardo Cardenas-Garcia filed a motion seeking dismissal, temporary release, or reconsideration of his detention order. (ECF No. 23.)

Among various exhibits, Defendant includes a declaration from an infectious disease specialist. (Meyer Decl., Declaration of Dr. Jamie Meyer ("Meyer Decl."))

On April 13, 2020, the Government filed a response. (ECF No. 25.) The Court held a hearing on April 15, 2020 and directed both Parties to meet and confer to determine what facts, if any, were disputed in Defendant's motion. (ECF Nos. 26, 27.)

On April 22, 2020, Defendant filed a second motion to dismiss. (ECF No. 30.) On April 23, 2020, the Government filed a response. (ECF No. 32.) On April 24, 2020, Defendant withdrew and re-filed the second motion with cover pages for the exhibits. (ECF Nos. 33, 34.) Defendant's second motion includes, among other documents, the statement of material facts ordered by Court, (ECF No. 34-1, Statement of Material Facts ("SMF") ¶¶ 3, 4), and Defendant's declaration. (ECF No. 34-2, Unsigned Declaration of Gerardo Cardenas-Garcia ("CG Decl.")) Defendant also filed a reply to the Government's response on April 24, 2020. (ECF No. 35.)

On April 27 and 29, 2020, the Court held hearings on Defendant's second motion. (ECF No. 46, 49.) At the April 27, 2020 hearing, the Court denied Defendant's request to reconsider the detention order. (ECF No. 46.) Defendant then filed a notice of appeal regarding the detention order. (ECF Nos. 40–42.)

On May 6, 2020, the Government filed a declaration by Warden C. LaRose of the OMDC. (ECF No. 47, Declaration of Warden C. LaRose ("W-Decl.")) Then, on May 11, 2020, Defendant filed a third motion to dismiss the indictment. (ECF No. 50.) The Government filed a response on May 12, 2020, (ECF No. 52), which includes an updated declaration from Warden C. LaRose. (ECF No. 52-1, Supplemental Decl. of Warden C. LaRose ("W2-Decl.")) On May 13, 2020, the Court held a hearing on the third motion, noting that the motions to dismiss would be deemed submitted once Defendant filed his reply. (ECF No. 54.) Defendant filed a reply on May 14, 2020. (ECF No. 55.)

/ / /

/ / /

## II.     Factual Background

### A. The COVID-19 Pandemic Reaches the United States.

COVID-19, the disease caused by the coronavirus known as SARS-CoV-2, is an emerging global health crisis, first detected in the United States as of late January 2020.[1] COVID-19 is "spread mainly through close contact from person-to-person in respiratory droplets from someone who is infected" and through contact with contaminated surfaces.[2] A significant percentage of those infected may not display any symptoms of the illness, as many are simply asymptomatic.[3] People with certain underlying health conditions and the elderly are known to be particularly at risk for medical complications related to the disease.[4] As of May 26, 2020, the Centers for Disease Control and Prevention ("CDC") reported 1,678,843 cases of COVID-19 in the US, with 99,031 deaths.[5]

---

[1] Ctrs. for Disease Control & Prevention ("CDC"), *First Travel-related Case of 2019 Novel Coronavirus Detected in the United States*, (Jan. 21, 2020), https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html.

[2] CDC, *How COVID-19 Spreads* (last viewed May 26, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[3] In late March, Dr. Redfield, Director of the CDC, confirmed in an interview that "that a significant number of individuals that are infected actually remain asymptomatic . . . as many as 25%." Sam Whitehead, *CDC Director on Models for The Months to Come: "This Virus Is Going to Be with Us,"* NATIONAL PUBLIC RADIO (March 31, 2020), https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us. Some research suggests that this percentage may be higher. *See* Amanda Arnold, *How Many People with the Coronavirus Are Asymptomatic?*, THE CUT (April 21, 2020), https://www.thecut.com/2020/04/how-many-people-with-the-coronavirus-are-asymptomatic.html ("In early April, one lab in Iceland reported that as many as 50 percent of cases could be asymptomatic; this past week, India's top medical research body reported that out of 100 infected people they studied, 80 did not have symptoms. In one Boston homeless shelter, where 400 guests were staying, 146 tested positive for COVID-19 last week, all of whom were reported to be asymptomatic.").

[4] CDC, *Groups at Higher Risk for Severe Illness* (last visited May 26, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#serious-heart-conditions.

[5] CDC, *Cases in the U.S.* (last visited May 26, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

Government entities have taken steps to reduce the spread of COVID-19. For example, local, state, and national leaders, including the President of the United States, have declared states of emergency in their respective jurisdictions that expand executive authority in addressing the pandemic.[6] Congress has likewise passed legislation to help provide necessary aid. *See* Coronavirus Aid, Relief, and Economic Security (CARES) Act, P.L. 116-136 (2020). Internationally, the World Health Organization ("WHO") has classified COVID-19 as a global pandemic.[7] Most recently, some states, including California, have begun to partially re-open businesses to alleviate the economic impact of the pandemic.[8]

### B. COVID-19 Creates Heightened Risks for Prison Populations.

COVID-19 presents heightened risks for incarcerated individuals. (Meyer Decl.) Social distancing is often impossible in "congregate settings," due to poor ventilation and inadequate space. (Meyer Decl. ¶ 9.) Many jails and prisons also lack the necessary resources to help prevent or treat an outbreak, including hygienic supplies (e.g., "sufficient hand soap and alcohol-based sanitizers"), "personal protective equipment for people who are incarcerated and caregiving staff," and "airborne negative pressure rooms" to isolate infected individuals. (*Id.* at ¶¶ 9, 10, 14.) In such circumstances, prisons

---

[6] President Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/; Governor Gavin Newsom, State of California, *Executive Order N-33-20* (March 19, 2020), https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf (implementing a stay-at-home policy); Governor Gavin Newsom, State of California, *Proclamation of a State of Emergency* (March 4, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf; Mayor Kevin Faulconer, City of San Diego, *Proclamation of Local Emergency* (March 12, 2020), https://www.sandiego.gov/sites/default/files/proclamation-state-of-local-emergency-covid-19.pdf.
[7] *See* WHO Director-General, *Opening Remarks at the Media Briefing on COVID-19* (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.
[8] *See* Jon Passantino, *California Reopening Begins Friday: Here's What You Need to Know*, CNN (May 8, 2020), https://www.cnn.com/2020/05/08/us/california-coronavirus-reopening/index.html.

may turn to solitary confinement as a means of managing an outbreak, but the use of such measures tends to backfire as they may result in less medical attention for isolated inmates and increased chances of death. (*Id.* ¶ 10.) Any dependency on local medical facilities, moreover, may be jeopardized if local hospitals and treatment centers are themselves "at or over capacity." (*Id.* ¶ 16.) Infections to prison staff and medical personnel, the movement of prisoners, and the high incidence of underlying health conditions among prison populations exacerbate these issues. (*Id.* ¶¶ 8, 13, 17 18.)

### C. The CDC Issues COVID-19 Guidelines for Prisons.

Recognizing that "[i]ncarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced," the CDC issued interim guidance on how to prepare for, prevent, and ultimately manage COVID-19 in prisons and detention environments on March 23, 2020.[9] The CDC recommends "pre-intake screening and temperature checks for all new entrants."[10] When admitted, symptomatic individuals should be medically isolated, while those known to have been in "close contact of a known COVID-19 case" are to be quarantined for 14 days.[11] The CDC also recommends a number of hygienic practices, including, "provid[ing] and continually restock[ing] hygiene supplies throughout the facility;" communicating hygienic practices in a manner understandable "by non-English speakers and those with low literacy;" providing no-cost access to soap, running water, and tissues; supplying hand sanitizer; and addressing the risks of shared drug use.[12] Social distancing also remains critical, and the CDC offers specific

---

[9] *See* CDC, INTERIM GUIDANCE ON MANAGEMENT OF CORONAVIRUS DISEASE 2019 (COVID-19) IN CORRECTIONAL AND DETENTION FACILITIES ("CDC PRISON GUIDANCE") at 2 (April 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.
[10] CDC PRISON GUIDANCE at 8, 10.
[11] CDC PRISON GUIDANCE at 10–11.
[12] CDC PRISON GUIDANCE at 10.

recommendations for social distancing in common areas, recreational areas, at mealtimes, in group activities, in the housing areas, and during medical care.[13]

In the event of a COVID-19 outbreak, the CDC recommends additional, more aggressive, measures to limit its spread and ensure adequate medical treatment. "As soon as an individual develops symptoms of COVID-19, they should wear a face mask (if it does not restrict breathing) and should be immediately placed under medical isolation in a separate environment from other individuals."[14] Likewise, inmates "who are close contacts of a confirmed or suspected COVID-19 case (whether the case is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days."[15] Facilities must be "mindful of [people] who are at higher risk of severe illness from COVID-19," including "older adults and persons of any age with serious underlying medical conditions such as lung disease, heart disease, and diabetes."[16] And, facilities "should ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms."[17] The CDC acknowledges that "different facility types . . . and sizes are not differentiated" in their recommendations and thus each facility may need to "adapt these guiding principles to the[ir] specific needs."[18]

### D. The Bureau of Prisons and Its Contractors Adopt Some of the CDC Guidelines to Combat the Spread of COVID-19.

The Bureau of Prisons ("Bureau" or "BOP") has adopted the CDC's guidance through a five-phase Action Plan. From January to March, the Bureau implemented its first three phases. The Bureau established a COVID-19 task force, suspended social and legal visits, curtailed inmate movement, canceled staff travel and training, limited access

---

[13] CDC PRISON GUIDANCE at 12.
[14] CDC PRISON GUIDANCE at 11.
[15] CDC PRISON GUIDANCE at 19.
[16] CDC PRISON GUIDANCE at 16, 20.
[17] CDC PRISON GUIDANCE at 23.
[18] CDC PRISON GUIDANCE at 3.

for contractors and volunteers, established enhanced screening for staff and inmates at select locations, modified operations to maximize social distancing in all BOP facilities, and stockpiled supplies in preparation for a protracted pandemic.[19]

During Phases 4 and 5, the Bureau updated its procedures to require all newly admitted BOP inmates to be assessed using a screening tool and temperature check, with the objective of temporarily quarantining asymptomatic inmates before admission and also isolating symptomatic inmates until they test negative for COVID-19.[20] The BOP also secured all inmates in their assigned quarters for a 14-day period and decreased incoming movement in coordination with the U.S. Marshals Service ("USMS").[21]

On April 14, 2020, the Bureau announced that it would extend these measures until May 18, 2020 as part of Phase 6 of the Action Plan.[22] On April 22, 2020, Bureau Director Michael Carvajal explained in a video message to all staff that eight specific BOP facilities would be used as initial quarantine locations for all newly admitted inmates from the USMS, and that the Bureau would "proceed expeditiously" in placing inmates on home confinement where feasible.[23]

Separate from the BOP's five-phase plan, CoreCivic has developed its own guidelines which are allegedly "consistent with recommendations of the [CDC] and its governmental partners, as well as state and local health authorities where its facilities are located." (W-Decl. ¶ 25.) CoreCivic's primary policy document was developed in February 2020 and has since been "continually updated," including through the addition

---

[19] Bureau of Prisons ("BOP"), *Update on COVID-19* (March 24, 2020), https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.
[20] BOP, *COVID-19 Action Plan: Phase Five* (April 1, 2020), https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.
[21] *Id.*
[22] BOP, *COVID-19 Action Plan: Phase Six* (April 14, 2020), https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf.
[23] BOP, *Director M.D. Carvajal Addresses All Staff* (April 22, 2020), https://www.bop.gov/resources/news/20200422_dir_message.jsp.

of various company-wide and facility-specific medical management plans. (W-Decl. at ¶¶ 33–36.) CoreCivic's plans are updated through each facility's conversations with CoreCivic's Emergency Operations Center, individual facility briefings, and ongoing contact with CoreCivic's government partners. (W-Decl. at ¶¶ 28–31.)

### E. CoreCivic Sees a Major Outbreak of COVID-19 at the OMDC.

Defendant currently resides at OMDC, a facility operated by CoreCivic. (ECF No. 47, Declaration of Warden C. LaRose ("W-Decl.") at ¶ 7.) CoreCivic is a for-profit enterprise which contracts with U.S. Immigration and Customs Enforcement ("ICE") and USMS to house both ICE immigration detainees and USMS criminal detainees. (W-Decl. at ¶ 7.) These populations of detainees are celled separately, even when housed in the same Pod. (W-Decl. at ¶ 11.)

Since April, OMDC has become home to one of the largest outbreaks of COVID-19 in the United States' prison system. The outbreak began in early April, as one detainee and two employees tested positively for COVID-19 by April 3, 2020.[24] Warden LaRose states that, by May 11, 2020, 68 USMS detainees had tested positive for COVID-19. (W-Decl. at ¶ 11.) Reporting indicates, moreover, that as many as 217 inmates have tested positive overall, not including prison and medical staff.[25] The COVID-19 outbreak at OMDC and CoreCivic's perceived mismanagement of the situation has come under significant scrutiny as detainees and inmates organized hunger strikes at the facility.[26]

---

[24] Kate Morrissey, *Immigrant Detainee, Second Employee at Otay Mesa Detention Center Test Positive for COVID-19*, SAN DIEGO UNION-TRIBUNE (April 3, 2020), https://www.sandiegouniontribune.com/news/immigration/story/2020-04-03/immigrant-detainee-and-second-employee-at-otay-mesa-detention-center-test-positive-for-covid-19.

[25] Kate Morrissey, *Judge Denies Request to Release Medically Vulnerable Federal Inmates from Otay Mesa Detention Center*, SAN DIEGO UNION-TRIBUNE (May 11, 2020), https://www.sandiegouniontribune.com/news/immigration/story/2020-05-11/judge-denies-request-to-release-medically-vulnerable-federal-inmates-from-otay-mesa-detention-center.

[26] Andrea Castillo, *Advocates Say Hundreds of Immigrants Detained in California are on Hunger Strike. ICE Says Only Two.*, L.A. TIMES (April 19, 2020), https://www.latimes.com/california/story/2020-04-

Two lawsuits, moreover, have also been filed seeking a reduction in the number of ICE detainees and USMS detainees at the OMDC.[27]

### F. Defendant was Held at OMDC from January to April 2020.

In January 2020, Defendant was arrested and then jailed at the Metropolitan Correctional Center (MCC). (CG Decl. ¶¶ 1–2.) Between February 6, 2020 and February 10, 2020, Defendant was moved from MCC to the OMDC. (CG Decl. ¶¶ 2, 4.) At OMDC, Defendant was initially assigned to a four-person cell in Pod T, (SMF ¶¶ 3, 4), which then housed about 60 detainees. (CG Decl. ¶ 11.)

On March 26, 2020, CoreCivic moved Defendant to Pod E. (SMF ¶¶ 8, 9.) From March 26, 2020, to April 22, 2020, Pod E housed USMS detainees with heightened COVID-19 risk-factors like Mr. Cardenas. (W-Decl. at ¶ 50; SMF ¶ 8.)[28] Pod E housed 12–13 people. (SMF ¶ 13.) Defendant observed inmates leave Pod E for hospital visits and return without undergoing an isolation period. (SMF ¶ 19.) Defendant was also unaware of anyone being tested for COVID-19, even though two inmates developed coughs in Pod E during the month of April. (SMF ¶¶ 35–37.) CoreCivic staff, moreover, did not perform daily evaluations of the inmates, never asked if he was experiencing COVID-like symptoms, and only checked his temperature once. (SMF ¶¶ 32–33.)

On April 22, 2020, CoreCivic moved Defendant Pod R as the facility consolidated high risk ICE and USMS detainees. (W-Decl. ¶51.) As of May 8, 2020, Pod R housed 20 detainees (12 USMS and 8 ICE). (W-Decl. ¶ 19.) That number fell to 15 inmates within a

---

19/advocates-say-hundreds-of-immigrants-detained-in-california-are-on-hunger-strike-ice-says-just-two-are.

[27] *Alvarez v. Larose*, No. 20-CV-00782-DMS, 2020 WL 2315807 (S.D. Cal. May 9, 2020); *Rodriguez Alcantara v. Archambeault*, No. 20-CV-0756-DMS, 2020 WL 2315777 (S.D. Cal. May 1, 2020).

[28] Defendant was identified as a detainee with heightened COVID-19 risk factors due to cardiac history. (W-Decl. ¶ 48.) In March 2019, Mr. Cardenas had a pre-heart attack while living in Tijuana, Mexico. (SMF ¶ 2.) His symptoms included chest pains, difficulty breathing, blurred vision, and cold hands and feet. (SMF ¶ 2.) He was informed by his doctor that he had a pre-heart attack, and now takes aspirin daily. (SMF ¶ 2.)

few days. (W2-Decl. at ¶ 15.) Pod R has had zero detainees test positive for COVID-19, and Defendant is housed in a single cell to permit social distancing. (W-Decl. ¶¶ 21–23.)

### G. Defendant Alleges His Custody at OMDC Violates Due Process.

#### 1. Testing & Isolation

As ICE's Health Services Corps has increased the testing numbers and lowered the threshold for testing, OMDC has seen an increase in numbers of detainees testing positive for COVID-19. (W-Decl. at ¶¶ 7, 17.) Defendant has not been tested for COVID-19 entering custody at OMDC. (SMF ¶ 35.) Defendant asserts, moreover, that "CoreCivic is not isolating symptomatic detainees quickly or reliably, even when they know about the symptoms." (ECF No. 50 at 15.)

#### 2. Face Masks & PPE.

OMDC distributed paper surgical style masks to inmates on April 10, 2020, April 24, 2020, and May 11, 2020. (W-Decl. ¶¶ 63, 64; W2-Decl ¶ 16.) Defendant received a mask on all three dates. (SMF ¶ 25; W-Decl. ¶ 65.) A medical expert cited by the Defendant avers that these masks should not be re-worn for health reasons and according to CDC guidance. (ECF No. 50-3 ¶¶ 1, 34.) OMDC has a standing policy to provide new masks "upon request." (W-Decl. ¶ 64.)

Based on his prior welding and sanding experience, Defendant is concerned that the masks he has been provided will become ineffective once worn. (SMF ¶¶ 27–28; CG Decl. ¶ 22.) As a result, Defendant has not consistently worn the masks provided to him to reserve them "for when the masks are needed most." (SMF ¶ 28.)

Also, Warden LaRose avers that staff who enter R Pod wear appropriate PPE, including face masks, eye protection, and gloves. (W-Decl. at ¶ 20.) Defendant contends that this guidance is not strictly followed. (ECF No. 50 at 8.)

#### 3. Social Distancing.

Defendant was unable to consistently socially distance in Pod E as inmates did not stay six feet apart at all times, would come into contact with each other in the common

10

areas, had to interact with medical staff and guards entering Pod E, and received meals from other detainees. (SMF ¶¶ 14–20.)

In Pod R, Defendant has his own cell and Pod R was, as of May 2020, at 16% capacity. (W-Decl. ¶ 19.) Nonetheless, Defendant asserts that he remains unable to socially distance as other inmates walk within six feet of him during free times and because "detainees circulate between the hospital and the unit without a fourteen-day isolation period." (ECF No. 50 at 14.)

### 4. Hygiene.

Defendant does not have access to hand sanitizer. (SMF ¶ 29.) Also, he alleges that showers in Pod E were not cleaned between uses. (SMF ¶ 30.)

### 5. Language Accessibility.

When CoreCivic provides information about COVID-19 to detainees, it does not always give a Spanish translation. (SMF ¶ 10.) Of all the information provided to Defendant about COVID-19, both in writing and orally, Defendant has only received Spanish translations on one or two occasions. (SMF ¶ 11.) CoreCivic has produced at least two informational flyers in Spanish, including guidance on mask use and COVID-19 symptoms. (*See* ECF No. 47-7; ECF No. 52-1.)

## III. Legal Standard for Dismissal of an Indictment

The Federal Rules of Criminal Procedure ("Rule") permit the Court to dismiss a charging instrument "if unnecessary delay occurs in: (1) presenting a charge to a grand jury; (2) filing an information against a defendant; or (3) bringing a defendant to trial." Fed. R. Cr. P. 48(b). "Rule 48(b) is a codification of the inherent power of a court to dismiss a case for want of prosecution." *United States v. Huntley*, 976 F.2d 1287, 1291 (9th Cir. 1992) (*United States v. Clay*, 481 F.2d 133, 137–38 (7th Cir. 1973)).

Dismissal of an indictment is also warranted where outrageous law enforcement conduct violates due process. *United States v. Ross*, 372 F.3d 1097, 1107 (9th Cir. 2004), on reh'g in part, 138 F. App'x 902 (9th Cir. 2005) (citing *United States v. Simpson*, 813

F.2d 1462, 1464–65 (9th Cir. 1987) ("*Simpson I*")). This power is derived from the Supreme Court's opinion in *United States v. Russell*, 411 U.S. 423 (1973), which recognized that there may be situations "in which the conduct of law enforcement officials is so outrageous that due process principles would absolutely bar the Government from invoking judicial process to obtain a conviction." *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991) (quoting *Russell*, 411 U.S. at 431–32). To establish outrageous government conduct, defendants must show conduct that violates due process in such a way that it is "so grossly shocking and so outrageous as to violate the universal sense of justice." *Id.* at 712 (quoting *United States v. O'Connor*, 737 F.2d 814, 817 (9th Cir.1984)) (internal quotation marks omitted). The defense is therefore "limited to extreme cases in which the government's conduct violates fundamental fairness." *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003).

Even if the conduct does not rise to the level of a due process violation, a court may nonetheless dismiss the indictment under its supervisory powers. *United States v. Barrera–Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991). Such a power may be exercised "to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct." *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011) (quotation omitted). The power, however, is not strictly limited to those uses. *United States v. W.R. Grace*, 526 F.3d 499, 511 n. 9 (9th Cir. 2008) (en banc).

**IV.    Analysis**

Defendant asks the Court to dismiss the indictment on the basis that his custody at OMDC violates due process. The Court finds that it does not because, though troubling, OMDC's conduct while holding the Defendant in custody was not "so outrageous that due process principles would absolutely bar the Government from invoking judicial process to obtain a conviction." *Restrepo*, 930 F.2d at 712.

As a starting point, the Court recognizes that COVID-19 presents heightened risks of individuals in congregate settings. As Dr. Meyer explains, prisons and jails are particularly susceptible to the spread of disease given the inherent inability of individuals to socially distance, the lack of necessary resources, and the high incidence of underlying health conditions among prison populations. (*See generally* Meyer Decl., Decl. of Dr. Jamie Meyer); *see also Fraihat v. U.S. Immigration & Customs Enf't*, No. ED-CV-19-1546-JGB, 2020 WL 1932570, at *4 (C.D. Cal. Apr. 20, 2020). Reporting now indicates that nearly 30,000 people in prison have tested positive for COVID-19.[29] OMDC is no exception and, in fact, appears to be among the worst hit facilities in the country to date.

Nonetheless, the record reveals that OMDC's reaction to the pandemic, though far from perfect, is not "outrageous." To the contrary, it appears that CoreCivic has taken proactive steps to protect its inmate population and, specifically, Mr. Cardenas. On March 26, 2020, for example, OMDC moved Mr. Cardenas to a pod specifically designated for high-risk USMS detainees to cohort those inmates and segregate them from the general population. (W-Decl. at ¶ 50; SMF ¶ 8.) OMDC then, in accordance with changing CDC guidelines, distributed surgical masks on three occasions to its inmates and has made its guidance on using masks available in Spanish. (W-Decl. ¶¶ 60, 63, 64; W2-Decl. ¶ 16; ECF No. 47-7 at 3.) Notably, Mr. Cardenas received a mask on each date. (SMF ¶ 25; W-Decl. ¶ 65; W2-Decl. ¶ 17.)

On April 22, 2020, OMDC again moved Mr. Cardenas, this time to a pod intended to house all high-risk detainees, Pod R. (W-Decl. ¶ 51.) In Pod R, Mr. Cardenas has been provided a single cell and thus need not share his cell with other inmates. (W-Decl. ¶ 22.) OMDC has also kept Pod R largely vacant by using it to house only 15–20 detainees, though it has the capacity to house 128 detainees. (W-Decl. ¶ 19; W2-Decl. ¶ 12.) In light

---

[29] The Marshall Project, *A State-by-State Look at Coronavirus in Prisons* (May 22, 2020), https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons.

of these facts, the Government's assertion that there is "sufficient space" to allow for appropriate social distancing is reasonable. (W-Decl. ¶ 22.) These steps, moreover, have been taken as a part of CoreCivic's broader COVID-19 reaction plan, which complies with ICE regulations, and with input from its government partners. (W-Decl. ¶¶ 33, 41, 42.) All in all, these facts show that OMDC is making an effort to address what is an unforeseen and complicated pandemic and, contrary to Defendant's argument, (ECF No. 34 at 17–18), that is sufficient here because the question is whether the Government's conduct is so outrageous as to render Mr. Cardenas's prosecution inconsistent with any "sense of justice." *Stinson*, 647 F.3d at 1209.

The Government's conduct, moreover, stands in stark contrast to the limited scenarios where courts have ordered dismissal for outrageous government conduct or under their supervisory power. Such instances include entrapment-like scenarios in which the government engineers the crime, *United States v. Smith*, 924 F.2d 889, 897 (9th Cir.1991), or cases where "the police have been brutal, employing physical or psychological coercion against the defendant." *United States v. Bogart*, 783 F.2d 1428, 1435 (9th Cir.1986) (citation omitted), *vacated in part on other grounds sub nom. United States v. Wingender*, 790 F.2d 802 (9th Cir. 1986). Neither scenario is analogous to the facts here. And, motions to dismiss an indictment are routinely rejected, even where, as with the OMDC here, the Government's conduct may have harmed others and troubles the Court. *See, e.g.*, *United States v. Hammond*, 263 F. Supp. 3d 826, 834 (N.D. Cal. 2016), *aff'd*, 740 F. App'x 573 (9th Cir. 2018) (denying motion to dismiss where government operated a child pornography website on its own servers for two weeks). In light of these cases, and on this record, the Court is not prepared to find that Mr. Cardenas's custody at OMDC has rendered his prosecution fundamentally unfair and warrants dismissal.

The Court notes, moreover, that some of the Defendant's allegations and declarations are not relevant here insofar as they do not concern his custody. *See, e.g.*,

(ECF No. 23 at 7–10.) In other words, what is relevant here is the Government's conduct as to the Defendant and his prosecution – *not* the impact of OMDC's policies in the prison generally or in Pods beyond those which housed the Defendant.

In the same vein, the Court also notes that, because the instant motion was filed within the context of Defendant's prosecution, much of Defendant's citations to civil matters arising under 42 U.S.C. § 1983 are an odd fit here for several reasons. *See, e.g.*, *Kingsley v. Hendrickson*, 576 U.S. 389 (2015); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 775 (9th Cir. 2019); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1122 (9th Cir. 2018); *Graves v. Arpaio*, 623 F.3d 1043 (9th Cir. 2010); *Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995); *Allen v. Kramer*, No. 15-CV-01609-MJS, 2016 WL 4613360, at *1 (E.D. Cal. Aug. 17, 2016). First, though these cases address due process claims for pre-trial detainees like the Defendant, they do not address the applicable standard for dismissal, namely, whether the Government's conduct was "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (quoting *Stinson*, 647 F.3d at 1209). Second, Defendant's motion arises from an ongoing pandemic as to which OMDC's policies are still in flux.[30] Thus, unlike these cases, the motion does not present a fixed, comprehensive set factual allegations from which the Court can infer the Government's adequate notice, failure to respond, or willful indifference.[31] Third, the Court lacks the benefit of the tools available in civil

---

[30] While the policies are in flux and the OMDC response is evolving, the Court finds most concerning Defendant's allegations that (1) OMDC staff failed to test, treat, and/or isolate inmates who display COVID-19 symptoms; (2) OMDC does not generally provide guidance in languages other than English; (3) OMDC staff do not consistently use PPE in Pod R; (4) Pod R inmates are not tested or quarantined as a matter of course upon returning from hospital visits; and (5) OMDC staff / ICE's Health Services Corps do not take daily temperature checks in Pod R. And, it is surprising that no written, updated plan exists to guide CoreCivic's response beyond the February 2020 document provided by Warden LaRose. (ECF No. 47-3.) While housed at OMDC, detainees are entrusted to the Government's care. OMDC and its government partners must do a better job of meeting that responsibility.

[31] The evolution of Defendant's allegations across the briefing illustrates this point. For example, while Defendant initially alleged that detainees had not received masks, the facts now show that Defendant

15

1 litigation – most notably, full discovery – with which to assess Defendant's allegations.
2 And, lastly, even if the cited precedents were applicable, dismissing the Indictment would
3 not necessarily follow. As with these civil suits, damages or an injunction against the
4 Government's violative conduct may be more appropriate. *See, e.g.*, *Helling v.*
5 *McKinney*, 509 U.S. 25, 35 (1993) (noting that on remand plaintiff may be entitled to
6 injunction requiring a new smoking policy); *Wallis*, 70 F.3d at 1075 (noting that plaintiff
7 brought a suit "for damages.") Defendant is welcome to file a separate civil complaint,
8 but the instant motion is no substitute.[32]

## V. Conclusion.

In sum, and for the foregoing reasons, the Court finds that OMDC's response to the emergency created by the COVID-19 pandemic neither evinces government conduct so outrageous as to violate his due process rights, nor merits an invocation of the Court's supervisory powers to dismiss the Indictment. Defendant's motions are **DENIED**.

**IT IS SO ORDERED.**

Dated: May 29, 2020

Hon. Gonzalo P. Curiel
United States District Judge

---

himself has since received three. Likewise, Defendant has been moved to multiple pods, each with differing custodial circumstances. And, as Defendant recognizes, OMDC has made some accommodations and improved its response to the pandemic over time. (*See* ECF No. 50 at 8–10.)

[32] And, notably, even if Defendant were to file such a complaint, a claim seeking his release on the basis that his conditions of confinement amount to a constitutional violation may be barred by the Prison Litigation Reform Act ("PLRA"). *See Alvarez v. Larose*, No. 20-CV-00782-DMS, 2020 WL 2315807, at *4 (S.D. Cal. May 9, 2020) (finding that a putative class of USMS inmates housed at OMDC were not likely to succeed on the merits of their fifth amendment due process claim because the Court was precluded from ordering their release by the PLRA).